IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-2191

ACHELEKE FUANYA

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

## COMPLAINT

---

1. Plaintiff Acheleke Fuanya brings this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) against Defendant, the United States of America, for the wrongful acts and omissions of its federal government employees acting within the course and scope of their federal employment.

2. On January 14, 2021, five Immigration and Customs Enforcement ("ICE") officials attacked Mr. Fuanya without provocation at Winn Correctional Center ("WCC") in Winnfield, Louisiana. The officers surrounded Mr. Fuanya, tripped him to the ground, and kneeled on his neck, and pulled his head forward in order to suffocate him. Other officers yanked his arms and twisted his leg and ankle. Even after Mr. Fuanya pleaded with the officers to get off of him because he could not breathe, they continued to choke him until they grabbed his fingers and forcibly fingerprinted him.

3. None of the officers involved in the attack wore masks. As a result, Mr. Fuanya tested positive for COVID-19 on February 3, 2021. The COVID-19 infection caused Mr. Fuanya to experience joint pain, loss of appetite, headaches, ear pain, body weakness, and difficulty breathing. He still suffers from chronic shortness of breath and hypertension.

4. The attack has also left Mr. Fuanya with persistent back and waist pain and Post-Traumatic Stress Disorder ("PTSD"). His PTSD causes him to suffer from intrusive recollections and dreams, sleeplessness, and loss of appetite.

## JURISDICTION

5. Under 28 U.S.C. §§ 1331, 1346(b), and 2671, this Court is vested with jurisdiction over Plaintiff's claim against the United States for the negligent and/or wrongful acts or omissions of its employees.

## VENUE

6. Venue is properly with the U.S. District Court for the District of Colorado under 28 U.S.C. § 1402(b) because Mr. Fuanya resides in Colorado Springs, Colorado.

## EXHAUSTION OF REMEDIES

7. Mr. Fuanya presented an administrative tort claim to the Office of General Counsel for the Department of Homeland Security, ICE's parent agency and the appropriate government agency for adjudication, on February 1, 2021. Six months have elapsed since that filing, and no agency action has been taken. Thus, Mr. Fuanya has exhausted administrative remedies prior to filing suit in accordance with 28 U.S.C. § 2675(a) and 28 U.S.C. § 2401(b).

**PARTIES**

8. Plaintiff Achekele Fuanya is an asylum seeker who fled persecution in his native Cameroon. On January 14, 2021, ICE officials attacked Mr. Fuanya at WCC.

9. Defendant United States of America is the appropriate defendant for claims brought pursuant to the FTCA. 28 U.S.C. § 1346(b).

**FACTS**

10. In 2018, Cameroonian police tortured Mr. Fuanya, disappeared his uncle and father, and sexually assaulted his mother because of his father's political dissident activities. As a result, Mr. Fuanya fled to the United States.

11. He arrived at the San Ysidro port of entry on April 1, 2019 and requested asylum from the U.S. officials there. U.S. Customs and Border Protection subsequently transferred Mr. Fuanya to ICE custody, where he remained until March 14, 2021.

12. A decision regarding his asylum case has been pending before the Tenth Circuit Court of Appeals since November 16, 2020.

13. On January 14, 2021, at around 8 a.m., Officer Smiley, a private prison guard employed by Lasalle Corrections at WCC told Mr. Fuanya's that he needed to sign a paper. Mr. Fuanya told the guards that he did not want to sign the paper because his lawyer told him not to sign anything without first consulting with her. Mr. Fuanya asked to see the paper, but Officer Smiley refused. He told Mr. Fuanya that they would come back at 1 p.m. to force him to sign.

14. At around 1 p.m., Lasalle guards came and told Mr. Fuanya that he needed to go to the WCC cafeteria. He complied.

15. When Mr. Fuanya arrived, five ICE officers and three Lasalle guards were waiting for him. Two of the Lasalle guards are named "Smiley" and "Green" and Mr. Fuanya does not know the name of the third Lasalle guard, but he was white, slim, and bald-headed. On information and belief the five ICE officers are Ryan Davis, Jeffrey Creekmore, Juan Martinez, Jason Miller, and Dustin Cain.

16. None of the guards there wore any masks. On January 14, 2021, ICE reported ten active COVID-19 cases among detained people at WCC.[1] At that time, ICE's Pandemic Response Requirements mandated that "[c]loth face masks should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19" and that facilities "[r]equire all staff (both medical and correctional) to wear PPE when encountering or interacting with any ICE detainee at a distance of less than six feet."[2] The Centers for Disease Control and Prevention's ("CDC") *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* also required that detention facility staff "[w]ear masks, unless PPE is indicated" and "[a]void non-essential physical contact."[3]

17. Officer Cain, who was wearing a red shirt and appeared to be supervising the other officers, told Mr. Fuanya to sit down. After Mr. Fuanya sat down, Officer Cain placed a document in front of him and demanded that Mr. Fuanya provide his signature and fingerprint. Officer Cain told Mr. Fuanya that if he did not comply, the officers would use force.

---

[1] *ICE Guidance on COVID-19*, Immigration and Customs Enforcement, Jan. 14, 2021, http://web.archive.org/web/20210114001543/https://www.ice.gov/coronavirus.
[2] *COVID-19 Pandemic Response Requirements Version 5.0*, Immigration and Customs Enforcement, Oct. 27, 2020, https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf
[3] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, updated Dec. 31, 2020, http://web.archive.org/web/20210114161357/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

4

18. Mr. Fuanya replied that his asylum case was on appeal at the Tenth Circuit Court of Appeals, that he would be killed if he returned to his country, and that he wanted to show the document to his attorney.

19. An angered Officer Cain told Mr. Fuanya that they had given him enough time and reiterated that the officers were going to force Mr. Fuanya to give his fingerprint and signature.

20. The other ICE officers gathered behind Mr. Fuanya and began to press on his neck with their hands. Others began grabbing Mr. Fuanya's hands. The officers then tripped him to the ground.

21. As Mr. Fuanya fell, he hit his head on the floor. Officers Martinez and Davis pressed their knees into his neck and shoulder and their hands onto Mr. Fuanya's head. One officer jumped onto Mr. Fuanya's back. Others pinned his knees to the ground, bending his leg backwards, twisting his ankle, and grabbing his arms. Mr. Fuanya began suffocating and shouted to the officers, "I cannot breathe, this is not fair." He then repeated that he could not breathe. He felt like his ankle was going to snap.

22. In a panic, Mr. Fuanya thought about George Floyd and wondered if the officers would kill him. Mr. Fuanya begged the officers, "please don't do this, what you are doing is not right. Please don't do this, I beg you. God is watching you."

23. Officer Cain responded, "we don't care." Officer Miller also said, "we don't care, we didn't ask for you people to come here." The ICE officers handcuffed Mr. Fuanya and one of the officers grabbed his finger and bent it back until they forcibly obtained his fingerprint on the document. Mr. Fuanya believes that the ICE officer attempted to break his finger.

24. The officers then picked up a distraught and hyperventilating Mr. Fuanya from the ground and brought him to the medical unit at WCC, where he was seen by Nurse Kim Boyett. All five ICE officers stayed in the medical unit with Mr. Fuanya during his examination. Officer Cain sat down right next to Mr. Fuanya. When Ms. Boyett gave Mr. Fuanya a paper to sign, he drew a sad face on the signature line.

25. Mr. Fuanya was in immense pain, especially in his wrists, neck, ankles, finger, and knees. Ms. Boyett took Mr. Fuanya's blood pressure, told Mr. Fuanya that his blood pressure was too high, and told him that he should calm down. She asked Mr. Fuanya where he felt pain and he responded and began crying. She never asked Mr. Fuanya how he sustained his injuries. The officers then uncuffed Mr. Fuanya and told him to return to his tier.

26. At no point before, during, or after this attack did Mr. Fuanya say or do anything threatening towards any other person.

27. Section 2.15 of ICE's 2011 Performance Based Detention Standards ("PBNDS"), which governs ICE operations at WCC, requires that "[p]hysical force shall only be used, when both necessary and reasonable."[4] Officers may use force without supervisor approval only "when a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility." Otherwise, officers must await a decision regarding use of force from "the on-site ranking detention official, a designated health professional and others," who will weigh "the detainee's history and the circumstances of the immediate situation."

---

[4] 2011 Performance Based National Detention Standards Chapter 2.15, Immigration and Customs Enforcement, revised Dec. 2016, https://www.ice.gov/doclib/detention-standards/2011/2-15.pdf

28. The PBNDS also authorizes force only to "the degree necessary and reasonable to gain control of a detainee or provide for selfdefense [sic] or defense of a third person." Even then, the standards require that staff "use only a level of force that is necessary and reasonable to gain control of a detainee" and enumerate a use of force continuum that officers should follow:

1. Staff Presence without Action
2. Verbal Commands
3. Soft Techniques
   Techniques from which there is minimal chance of injury (e.g., grasping, using empty-hand and/or "come-along" holds, using impact weapons for holds, applying pressure to pressure points, using chemical agents).
4. Hard Techniques
   Techniques with which there is a greater possibility of injury (e.g., strikes, throws, "takedowns," or striking using impact weapons such as expandable batons, straight batons, authorized less-lethal devices and specialty impact weapons).
5. Deadly Force
   The use of any force that is reasonably likely to cause death or serious physical injury. Deadly force does not include force that is not reasonably likely to cause death or serious physical injury, but unexpectedly results in such death or injury.

The PBNDS also requires that officers be trained on the use of force continuum.

29. Recollections of this attack haunted Mr. Fuanya. He felt hopeless and fearful. He constantly experienced intrusive thoughts and nightmares that the officers would come back and beat him again. When he heard or saw any ICE officers around WCC, he would tense up in fear. He needed pills to sleep. He experienced physical pain in his finger, ankles, and knee. The pain in his back and waist worsened as time passed.

30. On February 2, 2021, WCC medical staff tested Mr. Fuanya for COVID-19. He was tested positive the next day. For the next few weeks, Mr. Fuanya experienced coughing, headaches, difficulty breathing, loss of appetite, joint pain, ear pain, and body weakness.

31. Though ICE released Mr. Fuanya from detention, he continues to deal with recurring pain in his waist and back. His back pain radiates when he wakes up in the morning,

any time he is not sitting straight up, and when he is standing for prolonged periods. His persistent lower back pain limits his ability to perform some activities of daily living including lifting objects, climbing stairs, and exercising. He now requires orthopedic care.

32. Mr. Fuanya is also left with psychological traumas as a result of ICE's attacks. He was recently diagnosed with PTSD and continues to experience a deep sense of despair, fear, and helplessness. His suffers from insomnia, restlessness, loss of appetite, memory loss, and intrusive thoughts and nightmares of ICE chasing him. Anytime there is a knock on the door, Mr. Fuanya experiences anxiety attacks. He refuses to leave his home unless others accompany him. He currently takes medications for psychotropic medications for his PTSD.

33. He also continues to suffer from hypertension and experience episodes of mild to moderate shortness of breath with activity as a residual effect of COVID-19. He now needs multiple medications to help him control his blood pressure.

34. These injuries were caused by the actions of the five ICE officers at WCC on January 14, 2021.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Battery**

35. The actions of the ICE officers constitute the tort of battery under Louisiana law. To prevail in a battery claim in Louisiana, a plaintiff must establish "harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." *Caudle v. Betts*, 512 So. 2d 389, 391 (La. 1987).

36. On January 14, 2020, five ICE officers here tripped Mr. Fuanya to the ground, kneeled on his neck, bent his legs and finger, and twisted his ankle. The officers warned Mr. Fuanya that they would use force against him and therefore intended to suffer that contact.

37. The actions of the ICE officers were the direct and proximate cause of the harm that Mr. Fuanya suffered. Mr. Fuanya in no way contributed to his own injuries.

38. Mr. Fuanya has a clearly established right to be free from excessive force from law enforcement officers. *See Shekleton v. Eichenberger*, 677 F.3d 361, 367 (8th Cir. 2012).

39. Respondent United States of America is liable to Mr. Fuanya for all damages resulting from his battery.

## COUNT TWO
## Intentional Infliction of Emotional Distress

40. The actions of the ICE officers constitute the tort of intentional infliction of emotional distress under Louisiana law. In order to recover for intentional infliction of emotional distress in Louisiana, a plaintiff must establish "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Company*, 585 So.2d 1205, 1209 (La. 1991).

41. The ICE officers engaged in extreme and egregious conduct here. Mr. Fuanya posed no threat at all to the officers or anyone else. Instead of following their own continuum of force standards in response to Mr. Tanyike's request to show his attorney the document, the officers tripped Mr. Fuanya to the ground, kneeled on Mr. Fuanya's neck, bent his legs and

9

finger, and twisted his ankle. Even after he told the officers that they could not breathe, they continued to attack him.

42. The emotional distress suffered by Mr. Fuanya is and was severe. During the attack, he thought that the officers were going to suffocate him to death. In the aftermath of the attack, he suffered from anxiety attacks whenever he was around ICE officers. He could not sleep and remained in a constant state of anxiety. He continues to suffer from PTSD, anxiety, and intrusive thoughts and nightmares today.

43. The officers desired to cause Mr. Fuanya emotional distress. Even after Mr. Fuanya begged the officers to release him because he could not breathe, two officers responded "we don't care." One officer remarked, "we didn't ask for you people to come here."

44. The actions of the ICE officers were the direct and proximate cause of the harm that Mr. Fuanya suffered. Mr. Fuanya in no way contributed to his own injuries.

45. Respondent United States of America is liable to Mr. Fuanya for all damages resulting from their intentional infliction of emotional distress.

## COUNT THREE
### Negligence

46. The actions of the ICE officers constitute the tort of negligence under Louisiana law. Under Louisiana law, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. C.C. Art. 2323.

47. Here, the ICE officers negligently and unreasonably failed to wear masks or properly maintain social distance when they confronted Mr. Fuanya in contravention of ICE and CDC requirements. Given those guidelines, the active COVID-19 outbreak at WCC, and the ubiquity of COVID-19 precautions at the time, reasonable officers should have known that harm

could result from their decision to not wear masks and then attack Mr. Fuanya at close range. As a result, Mr. Fuanya was infected with COVID-19 and suffered grave illness.

48. ICE supervisors responsible for supervising ICE officers negligently supervised and trained the ICE officers here. *See Roberts v. Benoit*, 605 So.2d 1032 (La. 1991). No supervisor ensured that the officers abided by either government COVID-19 protocols or ICE's use of force continuum. Therefore, Mr. Fuanya's injuries resulted from ICE failures of training and supervision.

49. These failures were the direct and proximate cause of the harm that Mr. Fuanya suffered. Mr. Fuanya in no way contributed to his own injuries.

50. Respondent United States of America is liable to Mr. Fuanya for all damages resulting from their intentional infliction of emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

a. Award Actual and Compensatory damages in an amount to be determined at trial, against Defendant United States of America for claims arising under the Federal Tort Claims Act;

b. Award Plaintiff all costs incurred in maintaining this action, including reasonable attorneys' fees under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified by law; and

c. Grant Plaintiff any other and further relief this Court deems just and proper.

Dated: August 12, 2021                               Respectfully submitted,

                                               /s/ Jeremy Jong
                                               Jeremy Jong
                                               Al Otro Lado

3511 Banks Street
New Orleans, LA 70119
Telephone: (504) 475-6728
Email: jeremy@alotrolado.org

*Pro Bono Counsel for Plaintiff*

12