**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-2191

ACHELEKE FUANYA

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

**RESPONSE TO DEFENDANT'S MOTION TO TRANSFER VENUE
OR, IN THE ALTERNATIVE, TO DISMISS FOR IMPROPER VENUE**

---

## INTRODUCTION

Plaintiff Acheleke Fuanya, a resident of Colorado Spring, Colorado filed this civil rights action under the Federal Tort Claims Act (FTCA) after Immigration and Customs Enforcement ("ICE") officers beat and choked him without provocation. Compl. ¶¶ 20-23, ECF No. 1. Defendant United States of America now moves to transfer this case to the Western District of Louisiana, arguing that Mr. Fuanya's immigration status precludes him from establishing residency in Colorado and that prudential factors also warrant transfer. *See* ECF No. 21.

Defendants' primary argument, that all noncitizens who are not Lawful Permanent Residents ("LPRs"), have no home venue for the purposes of 28 U.S.C. § 1402(b), defies that statute's plain language and Congress' intent, as other district courts have made clear. As Mr. Funaya's asylum case is pending before the Fifth Circuit Court of Appeals, he is lawfully present in the United States and therefore resides in Colorado.

Likewise, Defendant has not met their burden to demonstrate that discretionary transfer is warranted. Mr. Fuanya resides here, as do his witness brother-in-law and sister and the doctor who examined him shortly after his release from immigration detention. While litigating in this district would cost Defendant little, transfer would burden Mr. Fuanya with the serious financial costs of litigating in Louisiana and emotional costs of forcing him to return to the site of the attacks that caused his Post Traumatic Stress Disorder ("PTSD"). As such, the Court should deny Defendant's motion to dismiss or transfer.

### STATEMENT OF FACTS

On April 1, 2019, after fleeing political persecution from a Cameroonian government that disappeared his uncle and father and sexually assaulted his mother, Mr. Fuanya presented himself to U.S. Customs and Border Protection ("CBP") officials at the San Ysidro port of entry and requested asylum. ECF No. 1 ¶¶10-11. CBP transferred Mr. Fuanya to Immigration and Customs Enforcement ("ICE") custody at Winn Correctional Center ("WCC") in Winnfield, Louisiana. *Id.* ¶11 On January 14, 2021, a WCC guards brought Mr. Fuanya to a room where five unmasked ICE officials were waiting for him. *Id.* ¶¶15-16.

After the ICE officials demanded that Mr. Fuanya provide his signature and fingerprint on a document, he replied that his asylum case was on appeal at the Tenth Circuit Court of Appeals, that he would be killed if he returned to his country, and that he wanted to show the document to his attorney. *Id.* ¶¶17-18. In response the officials grabbed Mr. Fuanya and tripped him, causing him to fall head first into the ground. *Id.* ¶¶19-21. The officers pressed their knees into Mr. Fuanya's neck and shoulder, and grabbed his head, arms, and leg. *Id.* ¶21. They bent his leg backwards, twisted his ankle, and continued to choke him even after he repeatedly pleaded

that he could not breathe. *Id*. ¶¶21-22. The ICE officials replied that they did not care and bent Mr. Fuanya's finger back to force his signature. *Id*. ¶23.

In the aftermath of the attack, Mr. Fuanya became fearful and sleepless, constantly experiencing intrusive thoughts and nightmares that the officers would come back and beat him again. *Id*. ¶23. The attack caused severe pain in his finger, ankles, knee, back, and waist. *Id*. Mr. Fuanya then tested positive for COVID-19 on February 3, 2021, which caused him to experience coughing, headaches, difficulty breathing, loss of appetite, joint pain, ear pain, and body weakness. *Id*. Mr. Fuanya reported these symptoms to his sister and brother-in-law shortly after the attack and continued to stay in touch with them regarding his post-attack symptoms and hardships. *See* Ex. 1, Declaration of Acheleke Fuanya ¶ 3.

After ICE released Mr. Fuanya, he went to live with his sister and brother-in-law in Colorado Springs, Colorado, where he continues to reside today. *Id*. ¶4. Mr. Fuanya received his Employment Authorization Document from the Department of Homeland Security ("DHS") on October 7, 2021 and his social security card from the Social Security Administration the next day. *See* Ex. 2, Employment Authorization Document; Ex. 3, Social Security Card. Mr. Fuanya currently works at an Amazon warehouse and makes between $500 and $600 per week. *See* Fuanya Decl. ¶6.  His sister  and brother-in-law still provide Mr. Fuanya with a phone, lodging, and transportation. *Id*. ¶7. Review of Mr. Fuanya's asylum case is currently pending before the Fifth Circuit Court of Appeals. *See Fuanya v. Garland*, No. 21-60746 (5th Cir.). DHS does not regard those who await judicial review regarding their asylum claim, like Mr. Fuanya, as unlawfully present in the United States.[1]

---

[1] *See* Donald Neufeld, USCIS Acting Assoc. Director, *et al., Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(1) of the Act,* 29, May 6, 2009 ("Neufeld Memo"), *available at* http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/revision_redesign_AFM.PDF.

On June 21, 2021, Dr. Carlos Franco-Paredes evaluated Mr. Fuanya and diagnosed him with PTSD and chronic lower back pain. *See* Ex. 4, Declaration of Dr. Carlos Franco-Paredes ¶24. To this day, Mr. Fuanya's PTSD causes him constant insomnia, restlessness, loss of appetite, memory loss, anxiety attacks and intrusive thoughts and nightmares of ICE chasing him. ECF No. 1 ¶¶ 31-32. Dr. Franco-Paredes notes that it would be potentially damaging to Acheleke's emotional state to have to return to the State of Louisiana for court hearings as it may trigger symptoms of post-traumatic stress disorder." Ex. 4 ¶23.

## LEGAL STANDARD

Defendant claims that Mr. Fuanya lacks statutory authority to choose his venue. In such cases, the plaintiff bears the burden to establish that venue is proper in the chosen district, but a court must draw all reasonable inferences and resolve all factual conflicts in the plaintiff's favor. *See Green v. Perry's Restaurants LTD*, No. 21-CV-0023-WJM-NRN, 2021 WL 5038824, at *1 (D. Colo. Oct. 29, 2021). At the motion to dismiss stage, a plaintiff need only demonstrate a *prima facie* showing that venue is proper. *Id.* Defendant also seeks discretionary transfer pursuant to 28 U.S.C. § 1404(a). In these cases, the moving party "bears the burden of establishing that the existing forum is inconvenient." *Id.* at 2.

## ARGUMENT

### I.    Mr. Fuanya Resides in and is Domiciled in This District.

Defendant argues that Mr. Fuanya has no domicile within the United States because he is not a LPR. ECF No. 21 at 4-9. However, noncitizens can establish venue in a judicial district where they are domiciled regardless of LPR status, and Mr. Fuanya is domiciled in the District of Colorado per the plain text and legislative history of 28 U.S.C. § 1391(c).

Generally, "[a]ny civil action on a tort claim against the United States under [the FTCA] may be prosecuted only in the judicial district where the plaintiff resides or [where the act occurred]." 28 U.S.C. § 1402(b). Likewise, plaintiffs may sue the United States "in any judicial district in which . . . the plaintiff resides . . ." 28 U.S.C. § 1391(e)(1)(C). "Residence" in both statutes is defined by 28 U.S.C. § 1391(c)(1), which states that "a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled." *Id.* § 1391(c)(1).

### A. The Plain Language of 28 U.S.C. § 1391 Allows Mr. Fuanya to Sue in This District.

Mr. Fuanya is a "natural person" within the meaning of § 1391(c)(1) as a "natural person" is simply "an individual." *See Mohamad v. Palestinian Authority*, 566 U.S. 449, 454 (2012). Because "the words of the statute are unambiguous, the judicial inquiry is complete," and Mr. Fuanya can establish venue here. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (internal quotation marks omitted).

Defendant argues that the phrase "including an alien lawfully admitted for permanent residence" limits the scope of § 1391(c)(1) to LPRs alone. *See* ECF No. 21 at 7. However, the Supreme Court has repeatedly rejected attempts to construe "including" as categorically excluding unnamed groups, finding instead that it means that the statute is "not limited to the examples that follow that word." *West v. Gibson*, 527 U.S. 212, 218 (1999); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 132–33 (2012) ("The verb to include introduces examples, not an exhaustive list."). Indeed, elsewhere in Title 28, Congress used the word "including" in just this manner. For example, in on statute, Congress provided for rules "requir[ing] the disqualification of any officer or employee of the Department of Justice, *including* a United States attorney or member of such attorney's staff, from

participation in a particular investigation or prosecution if such participation may result in a . . . conflict of interest . . . ." 28 U.S.C. § 528 (emphasis added). This text provides no reason to believe that U.S. Attorneys and their staff members are the only employees subject to these rules, and the resulting regulations do not single out any such group. *See, e.g.,* 28 C.F.R. §§ 45.1-45.2 (explaining that "[e]mployees of the Department of Justice" are subject to a variety of ethical standards and financial disclosure regulations). The Seventh Circuit has indicated that this provision is applicable to the Attorney General for instance. *See In re Grand Jury Subpoena of Rochon*, 873 F.2d 170, 175 (7th Cir. 1989). Here, Congress consciously chose to use "including" in § 1391(c)(1) rather than limiting phrases such as "only if" or "limited to," as it does in 8 U.S.C. §1226(c)(2), which authorizes release of certain groups of noncitizens from detention and 42 U.S.C. § 12655i, which specifies that participation in government programs "shall be limited to individuals who" fulfill certain prerequisites.

Indeed, multiple courts have concluded that the phrase "including an alien lawfully admitted for permanent residence" § 1391(c)(1) is an illustrative, rather than limiting example. First, in *Alvarado v. United States*, the district court reasoned that because the statute's language unambiguously includes all "natural persons," "[t]he plain text of 1391(c)(1) authorizes all non-citizens—regardless of LPR status—to establish residency where they are domiciled." No. CV 16-5028, 2017 WL 2303758, at *2 (D.N.J. May 25, 2017). Similarly, in *Flores v. United States*, the court found that the statute was "unambiguous on its face" and that "[a]lienage is not a reason stated in the statute as a basis for finding persons outside its reach." 108 F. Supp. 3d 126, 131 (E.D.N.Y. 2015). Consequently, both the *Alvarado* and *Flores* courts ruled that the non-LPR noncitizens in those cases could file in the district where they were domiciled. *Id*. at 131; *Alvarado*, 2017 WL 2303758, at *2-3. Likewise, a multitude of courts have assumed that a

non-LPR noncitizen's home forum is an appropriate venue. *See e.g. Adrianza v. Trump*, 505 F.

Supp. 3d 164, 174 (E.D.N.Y. 2020) (Noncitizen subject to removal could sue in his home

district); *Rasool v. Mayorkas*, No. 1:21-CV-02367 (TNM), 2021 WL 5492976, at *1 (D.D.C.

Nov. 23, 2021) (asylum applicant); *Doe v. United States*, No. 3:16-CV-0856, 2017 WL 4864850,

at *1 (M.D. Tenn. Oct. 26, 2017) (asylum applicants); *Chakrabarti v. United States Citizenship

& Immigr. Servs.*, No. CV 21-1945 PJM, 2021 WL 4458899, at *2 (D. Md. Sept. 29, 2021)

(employment based nonimmigrants); *N-N v. Mayorkas*, No. 19-CV-5295(EK), 2021 WL

1997033, at *1, 6 (E.D.N.Y. May 18, 2021) (U nonimmigrant status petitioner). As such, the

plain language reading of the statute makes clear that Mr. Fuanya is a resident of this district.

**B. Canons of Statutory Construction Favor Interpreting 28 U.S.C. § 1391 to Not Limit Residency for Venue Purposes to LPRs.**

Defendant mostly points to the legislative history of 28 U.S.C. § 1391 to argue that only

LPRs can be residents of a particular district. *See* ECF No. 21 at 4-9. However, that legislative

history provides little support to Defendant's argument. Instead, the 2011 amendments cited by

Defendant primarily serve to establish domicile as the defining feature of residence for venue

purposes and ensure that LPRs, but not only LPRs, could raise a venue defense. Through these

amendments, Congress resolved an existing circuit split over whether "residence" should be

equated with "domicile." H.R. Rep. 112-10, at 20-21 (2011).

Specifically, Congress made two changes affecting noncitizens. First, Congress amended

28 U.S.C. § 1391(c)(1), adding the LPR language with the goal of limiting venue defenses to

those who could "form the intent to remain in this country indefinitely." *Id*. at 23 n.16. In so

amending, Congress certainly legislated with knowledge that certain noncitizens without LPR

status could form intent to remain and even cited a case stating that LPR status is not a

prerequisite to establishing domicile. *Id*. (*citing Castellon-Contreras v. I.N.S.*, 45 F.3d 149 (7th

Cir. 1995)). In *Castellon-Contreras*, the court concluded that domicile turns on an individual's capacity to form a lawful intent to remain. 45 F.3d at 153-54 ("In order to have a 'lawful domicile,' . . . an alien must have the ability, under the immigration laws, to form the intent to remain in the United States indefinitely. . . . aliens can become lawful domiciliaries without first obtaining LPR status."); *accord White v. I.N.S.*, 75 F.3d 213, 215 (5th Cir. 1996) (same); *Lok v. I.N.S.*, 548 F.2d 37, 40 (2d Cir. 1977) (holding that LPR status was not necessary to establish "lawful domicile.").

Second, Congress revised 28 U.S.C. § 1391(c)(3) to focus on domicile, making changes "shifting the focus from 'alienage' of a defendant to whether the defendant has his or her 'residence' outside the United States."  *See* H.R. Rep. 112-10, at 22. Indeed, the amendments make clear that even "United States citizens domiciled abroad could not claim a venue defense to the location of litigation" *Id*. As such, the operative analysis when determining residence in whether the litigant can form the requisite intent to remain.

Defendant primarily relies on *In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018), a case deciding whether a foreign corporation domiciled abroad could mount a venue defense. The court held that the 2011 amendment was a "modest adjustment limited to natural persons," that did not affect established case law regarding venue for foreign corporations. *Id.* at 1356, 1358–60. The dicta in that case stated that 2011 amendments applied to immigrants with "permanent resident status," but it did not analyze that issue, and the dicta was irrelevant to the case's holding. *See Coyoy v. United States*, 526 F. Supp. 3d 30, 41 n.11 (D.N.J. 2021) (Finding that *HTC* did not apply where the government challenged venue in a FTCA case brought by an asylum applicant). Indeed, almost every court that has actually analyzed  have found that Congress intended to allow noncitizens to raise venue defenses if they could establish intent to

remain and used LPRs as an illustrative and not a limitative example. *Id*. at 41 (a "person who *is* capable of forming such an intent may, consistent with Congress's intent, be eligible to be considered a "resident" within the meaning of 28 U.S.C. §§ 1391(c)(1) and 1402(a)"); *Alvarado*, 2017 WL 2303758 at *3 at *6–7 ("Here, the general principle is that 'natural persons' can establish residency where they are domiciled, and individuals with LPR status are merely an illustrative example of natural persons."); *Luna v. United States*, No. C20-1152RSL, 2021 WL 673534, at *2 (W.D. Wash. Feb. 22, 2021).[2]

Moreover, courts should not interpret any statutory provision in a way that would render it or another part of the statute inoperative or redundant. *See Colautti v. Franklin*, 439 U.S. 379, 392 (1979). If Congress meant to limit domicile to LPRs, it would not have used the word "including" in 28 U.S.C. §§ 1391(c)(1). As discussed in subsection A, *supra*, reading the LPR provision to mean that only LPRs can choose venue renders the word "including" superfluous. Similarly, the court in *Coyoy* used the statutory construction canons of "*ejusdem generis* ('of the same kinds, class, or nature') and *noscitur a sociis* ('a word is known by the company it keeps')" to find that "the example of permanent residents, though not exclusive, suggests that other examples must possess some common, relevant feature." 526 F. Supp. 3d at 37. As both the legislative history and statutory context indicate that Congress did not intend to preclude non-LPR noncitizens who intend to remain in a district indefinitely from establishing domicile.

**C. Because Mr. Fuanya's Asylum Application is Pending, He is a Colorado Domiciliary.**

Defendant is correct in that domicile "requires not only physical presence, but also an intent to remain in the forum state indefinitely." ECF No. 21 at 8. However, Defendant is

---

[2] Defendant also cites *Najera v. United States*, No. 1:16CV459 (JCC/JFA), 2016 WL 6877069 (E.D. Va. Nov. 22, 2016), but no court has followed *Najera* with at least two courts explicitly disregarding its conclusions. *See Alvarado,* 2017 WL 2303758, at *5*; Coyoy,* 526 F. Supp. 3d at 41 n.11.

mistaken when it asserts that Mr. Fuanya lacks the ability to remain here indefinitely because he is not lawfully present and does not have permission to remain permanently. *Id*. at 9.

The operative questions here are whether Mr. Fuanya is "lawfully present in the United States and has taken steps under the immigration laws that objectively manifest an intent to make permanent his residence here can claim residence for purposes of the venue statute." *Luna*, 2021 WL 673534, at *2. A pending asylum application, "if granted, will furnish a legal basis to" remain permanently in the United States." *Coyoy*, 526 F. Supp. 3d at 42. Thus, a noncitizen who "currently seeks asylum in the United States. . . is capable of forming such a lawful intent to remain." *Id*. at 36; *see also In re Mendoza*, 597 B.R. 686, 693–94 (Bankr. S.D. Fla. 2019) ("[A]n immigrant legally can form the permanent intention required to establish a U.S. domicile if the immigrant lawfully can reside in the U.S. indefinitely" pursuant to a pending asylum application).

The *Flores* decision is particularly instructive here. In that case, the court found that the plaintiff could chose her venue because as an asylum applicant on parole, she was "lawfully present in the United States" pursuant to the Immigration and Naturalization Act ("INA") and DHS' *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(1) of the Act* memorandum. 108 F. Supp. 3d at 130. Analogously, Mr. Fuanya's application for asylum is pending before the Fifth Circuit Court of Appeals. *See Fuanya*, No. 21-60746. As in *Flores*, this court must first look to the INA to determine if Mr. Fuanya is lawfully present. The relevant INA statute states that "no period of time in which an alien has a bona fide application for asylum pending. . .shall be taken into account in determining the period of unlawful presence in the United States. . .unless the alien

during such period was employed without authorization in the United States." 8 U.S.C. § 1182(a)(9)(B)(iii). DHS interprets the phrase "bona fide asylum application" to mean:

> a properly filed asylum application that has a reasonably arguable basis in fact or law, and is not frivolous. If this is the case, unlawful presence does not accrue while the application is pending unless the alien engages in unauthorized employment. DHS considers the application for asylum to be pending during any administrative or **judicial review (including review in Federal court)**.

Neufeld Memo at 29 (emphasis added). Mr. Fuanya properly applied for asylum at a port-of-entry and his application remains pending judicial review, he is therefore lawfully present in the United States and has not accrued even a day of unlawful presence. *See* Ex. 1 ¶1, His lawful presence is further supported by DHS' and the Social Security Administration's decision to grant Mr. Fuanya an employment authorization document and social security card, respectively. *See* Ex. 2. 3. He has therefore demonstrated an "ability under the immigration laws to form the intent to remain" indefinitely just like the plaintiffs in *Flores, Coyoy, Luna,* and *Mendoza* and is consequently domiciled in this district, where he lives.[3] H.R. Rep. 112-10, at 23 n.16.

## II.     The Interests of Convenience and Justice are Served by Denying Transfer.

This Court should also deny Defendant's motion to transfer on discretionary grounds. A court may transfer a case "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it

---

[3]Defendant also argues that sovereign immunity principles require that the domicile issue be resolved in their favor. ECF No. 21 at 9 n.8. However, Defendants cite no case in which any court has found that sovereign immunity, which usually applies in determining subject matter jurisdiction rather than venue, protects the government from suit in the district in which a noncitizen resides. Indeed, *Pennhurst State Sch. & Hosp. v. Halderman*, cited by Defendant, is a case regarding the circumstances under which states can be sued in federal court. 465 U.S. 89, 99 (1984); Similarly, *Reuber v. United States,* another case relied upon by Defendant, concerns whether pendant jurisdiction exists to bring FTCA claims in districts *other than* the ones listed in § 1402(b). 750 F.2d 1039, 1048 (D.C. Cir. 1984). Courts should not "assume the authority to narrow the waiver [of sovereign immunity] that Congress intended." *States* v. *Kubrick*, 444 U.S. 111, 117-118 (1979). For all the reasons listed in the preceding two sections, Congress clearly intended to condition domicile on an individual's capacity to form a lawful intent to remain in the relevant district.

might have been brought." 28 U.S.C. § 1404(a). Defendant, as the party seeking to transfer in this case, bears the burden of establishing that the existing forum is inconvenient. *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir. 1991). In addition, "[u]nless the balance of the inconvenience is strongly in favor of the movant, the plaintiff's choice of forum should rarely be disturbed." *Green*, 2021 WL 5038824, at *1 (quoting *Bailey v. Union Pac. R.R. Co.*, 364 F. Supp. 2d 1227, 1229 (D. Colo. 2005)).

> In determining whether transfer is appropriate, a court considers the following factors:
>
> (1) plaintiff's choice of forum;
> (2) the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses;
> (3) the cost of making the necessary proof;
> (4) questions as to the enforceability of a judgment if one is obtained;
> (5) relative advantages and obstacles to a fair trial;
> (6) difficulties that may arise from congested dockets;
> (7) the possibility of the existence of questions arising in the area of conflict of laws;
> (8) the advantage of having a local court determine questions of local law; and
> (9) all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Texas Gulf Sulphur Co. v. Ritter*, 371 F.2d 145, 147 (10th Cir. 1967). Notably, several courts weighing these factors in FTCA cases involving ICE or CBP's abuses have ruled against similar transfer motions. *See, e.g., Doe*, 2017 WL 4864850, at *2-3 *Alvarado*, 2017 WL 2303758, at *6-8; *Flores*, 142 F. Supp. 3d at 287-91. For the reasons below, this Court should do the same.

### A.  Plaintiff's Choice of Forum.

Courts must afford a Plaintiff's choice of their home venue substantial deference. *Green*, 2021 WL 5038824, at *3 n.3. Colorado is unquestionably Mr. Fuanya's home as he lives and works in the district, has spent his entire time free in the United States in the district, and intends to remain there. *See* Fuanya Decl. ¶¶ 4-8. Accordingly, this factor weighs in his favor.

**B.   Accessibility of Witnesses and Other Sources of Proof, Including the Availability of Compulsory Process to Insure Attendance of Witnesses.**

The second set of factors in this case, which concern the accessibility of evidence and witnesses, weighs against transfer for several reasons. First, Mr. Fuanya's witnesses would be disadvantaged by transfer to Louisiana. Dr. Carlos Franco-Paredes, who evaluated Mr. Fuanya in the wake of ICE's attack, practices medicine at the UCH Infectious Disease Clinic and serves as Associate Professor of Medicine-Infectious Disease at the The University of Colorado Anschutz Medical Campus in Aurora, Colorado. *See* Franco-Paredes Decl. ¶¶1, 6; *Palace Exploration Co. v. Petroleum Dev.*, 316 F.3d 1110, 1122 (10th Cir.2003) (Finding the location of an expert witness relevant in § 1404(a) analysis). Mr. Fuanya's treating mental health professionals will also be located in Colorado. Fuanya Decl. ¶11. Finally, Mr. Fuanya's sister and brother-in-law, to whom he recounted the details of ICE's attack and the hardships he experienced in its wake, live in Colorado. *Id*. ¶4.

Defendant's assertion that defense witnesses are located in Louisiana significantly favors transfer is also mistaken. ECF No. 21 at 12-13. As an initial matter, Plaintiff's counsel can depose all Louisiana witnesses in Louisiana. In addition, depositions by videoconference can mitigate almost all of the burden that Defendant claims that its employees will suffer.  Further, as this Court has explained, "in this age of videoconferencing and electronic transmission of data, the incidental costs of interstate litigation can be effectively managed by both sides. *Level 3 Commc'ns, LLC v. Beavex Inc.*, No. 17-CV-02392-MSK-KLM, 2018 WL 558055, at *5 (D. Colo. Jan. 25, 2018). This Court may also consider "whether the trial testimony is capable of presentation by video deposition or videoconference." *Nationwide Telecom Inc. v. Dollar Phone Corp.*, No. 16-CV-2495-MSK-MJW, 2017 WL 4123938, at *4, n.4 (D. Colo. Sept. 18, 2017),

*order vacated on reconsideration on other grounds*, No. 16-CV-2495-MSK-MJW, 2018 WL 1640252 (D. Colo. Apr. 5, 2018). Indeed, during the current pandemic, the Court regularly conducts its hearings by videoconference. *See Green*, 2021 WL 5038824, at *4; D. Colo. General Order No. 2021-12 at 2; D. Colo, Jury Trial Protocols- Revised August 9, 2021 at 3.

Here, Defendants have not explained why video depositions and testimony would be infeasible, only arguing conclusorily that "[t]he United States is entitled to present in-person testimony." ECF No. 21 at 13 n.9. Defendant provides neither legal support for that supposition nor any reason why any potential witness would be prejudiced by providing video testimony or traveling to Colorado. *See Green*, 2021 WL 5038824, at *3 (denying transfer where party did not identify particular witnesses who would be inconvenienced by travel and where depositions could be taken remotely"); *see also Flores*, 142 F. Supp 3d at 289 ("[V]ideotapes of witnesses' testimony and testimony via live video is available for witnesses who are unwilling to travel."); *Alvarado*, 2017 WL 2303758, at *7; *Doe*, 2017 WL 4864850, at *3.

Further, courts apply minimal weight to this factor where the party asserting inconvenience is the government, because the government can compel its witnesses to testify. Here, the witnesses listed by Defendant are either employees of Defendant, or in the case of WCC's nurse, Defendant's contractor. ECF No. 21 at 12. Leaving aside the fact that Defendant has not identified any witnesses that it believes will not testify, it can compel any intransigent witnesses to do so. *See Alvarado*, 2017 WL 2303758, at *7 ("As federal employees, these witnesses may be compelled to testify by the Government."); *Doe*, 2017 WL 4864850, at *3 (same). Finally, Federal Rule of Civil Procedure 45 "was amended [in 2013] to allow nationwide service." *Miller v. Ghirardelli Chocolate Co.*, No. C 12-4936 LB, 2013 WL 6774072, at *5 (N.D. Cal. Dec. 20, 2013). As a result, this Court can deal with the problem of third-party witnesses

who are unwilling to testify if and when it arises by commanding them to do so via videoconference within 100 miles of their home. *See* Fed. R. Civ. P. 45(c)(1)(A). Accordingly, this factor also weighs against transfer.

### C.  Cost of Making the Necessary Proof.

As Mr. Fuanya and United States' resources differ dramatically, this factors weighs in favor of honoring Mr. Fuanya's choice to sue in his home district. Simply "shifting the inconvenience from one side to the other…obviously is not a permissible justification for a change of venue" *Scheidt v. Klein*, 956 F.2d 963, 966 (10th Cir. 1992). Where "there is a significant disparity in the relative means of the parties… this factor weighs against the requested transfer." *Doe*, 2017 WL 4864850, at \*2; *see also Alvarado*, 2017 WL 2303758, at \*6; *Flores*, 142 F. Supp. 3d at 289. Furthermore, "any documentary evidence related to the matter can be reproduced and transmitted electronically," and as noted above, the cost to Defendant will not decrease dramatically with transfer as the parties can use videoconferencing to eliminate the cost of travel. *Alvarado*, 2017 WL 2303758, at \*7; *Green*, 2021 WL 5038824, at \*7. Notably, transfer is inappropriate in situations like this one in which a party "puts forth no specific evidence regarding potential litigation costs." *Congo Works, LLC v. Gray & Co., Inc.*, No. 19-CV-00302-REB-KMT, 2019 WL 13036161, at \*4 (D. Colo. Oct. 10, 2019).

While the government can draw on a nearly limitless pool of resources, there is real risk that financial considerations will prohibit Mr. Fuanya from traveling to Louisiana to litigate this case. He makes only $500 to $600 per week and relies on his family's support to cover basic living expenses such lodging, phone, and transportation. Fuanya Decl. ¶¶7. As Mr. Fuanya expects his financial situation to remain unchanged in the near future and his family lacks the resources to pay more of his expenses, he may not be able to afford a plane ticket, transportation,

and lodging in rural Louisiana, which does not have the same public transportation infrastructure that Colorado does.[4] *Id*. ¶¶6-7. He does not have a car and may not be able to afford ground transportation to Louisiana either. *Id*.

### D.  Relative Advantages and Obstacles to a Fair Trial.

Transfer to Louisiana would take Mr. Fuanya away from the mental health care necessary to cope with the aftermath of ICE's attack, for the duration of any trial. *Id*. ¶11. Furthermore, return to Louisiana would risk retriggering Mr. Fuanya's PTSD, which continues to cause him insomnia, restlessness, loss of appetite, memory loss, anxiety attacks, and intrusive thoughts and nightmares of ICE chasing him. ECF No. 1 ¶¶ 31-32. Returning to the scene of a traumatic event can trigger additional PTSD symptoms, and those symptoms affect a witness' ability to testify accurately.[5] Dr. Franco-Paredes attests that "it would be potentially damaging to Acheleke's emotional state to have to return to the State of Louisiana for court hearings as it may trigger symptoms of post-traumatic stress disorder." Franco-Paredes Decl. ¶24. As forced return to Louisiana risks a exacerbation of Mr. Fuanya's mental illness and therefore the ability for him to testify competently, the interests of justice favor denial of Defendant's motion. *See Luna*, 2021 WL 673534, at *3 ("[W]here the evidence shows that the financial, logistical, and health challenges associated with a transfer would likely make it impossible for plaintiff to pursue his claims, the government has not met its burden.").

---

[4] *See* Transportation Rankings, US News and World Report, accessed Dec. 9, 2021, https://www.usnews.com/news/best-states/rankings/infrastructure/transportation (ranking Colorado 20th in public transit usage and Louisiana 48th).

[5] *See*  Mary Jo DiLonardo, *What Are PTSD Triggers?*, WebMD, May 15, 2021, https://www.webmd.com/mental-health/what-are-ptsd-triggers; Landy F. Sparr and J. Douglas Bremner, *Post-traumatic Stress Disorder and Memory*; Journal of the American Academy of Psychiatry and the Law Online March 2005, 33 (1) 71-78; http://jaapl.org/content/33/1/71 ("Evidence from a variety of studies has shown a relationship between PTSD and deficits in explicit memory function.").

### E.  Difficulties that May Arise from Congested Dockets.

Defendant claims that "the docket in the District of Colorado is currently more congested than the Western District of Louisiana." ECF No. 21 at 15. However, the statistics cited by defendants paint a more complicated picture. Defendant points to statistics indicating that this district has a marginally higher average number of pending cases per judge, weighted filings per, and duration from filing to disposition in criminal cases.[6] *Id*. While true, Defendant fails to mention that an average civil case takes 7.8 months to complete in this district compared to 10.8 months in the Western District of Louisiana and that 4.8 percent of civil cases are over three years old in this district compared to 15 percent in the Western District. As the congestion in civil cases like this one is comparatively greater in Louisiana, this factor favors Mr. Funya.

### F.  Advantage of Having a Local Court Determine Questions of Local Law.

Defendant argues that this case should be transferred so that a Louisiana district court may apply substantive Louisiana law. ECF No. 21 at 14. However, as noted in one case cited by Defendant, application of state law by an out of state district court is a factor accorded relatively little weight "because federal judges are qualified to apply state law," especially in cases involving relatively simple legal issues and where substantive law is "essentially equivalent with respect to the relevant issues." *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1169–70 (10th Cir. 2010); *see also*, *Flores*, 142 F. Supp. 3d at 290 ("Plaintiff's state law tort claims, which sound in common law negligence, are not complex. The court can ascertain Texas law with help from counsel.").

---

[6] Defendant argues that this district "has a longer average time from filing to trial than any district court in the Fifth Circuit where statistics are available," but statistics are not available for the Western District of Louisiana, so this comparison is not probative here.

Defendant infers that Louisiana's Civil Law history inhibits this Court's ability to apply Louisiana laws. ECF No. 21 at 14. However, the Louisiana law to be applied heris neither complex or uncommon. The primary claims in this case- battery, intentional infliction of emotional distress, and negligence- are functionally identical in Louisiana and Colorado. In Colorado battery cases, a defendant is liable if she acts intending to cause a harmful or offensive contact. . . and an offensive [or harmful] contact with the person of the other directly or indirectly results. *White v. Muniz*, 999 P.2d 814, 816 (Colo. 2000). Similarly, in Louisiana a Defendant is liable in cases in which there is "harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." *Caudle v. Betts,* 512 So. 2d 389, 391 (La. 1987). In Colorado a defendant who "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999). Analogously, in Louisiana, a defendant is liable if plaintiff establishes "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Company*, 585 So.2d 1205, 1209 (La. 1991). Finally, both Colorado and Louisiana courts resolve negligence cases by determining whether a duty exists, whether the defendant has breached such a duty, whether there is a legal and factual causal connection between the offensive conduct and the resulting injury; and whether that plaintiff suffered actual damages. *Compare Hall v. McBryde By & Through McBryde*, 919 P.2d 910, 913 (Colo. App. 1996); *Reigel v. SavaSeniorCare L.L.C.,* 292 P.3d 977, 985 (Colo. App. 2011) *with Verdun v. State through Dep't of Health & Hum. Res.,* 598 So. 2d 1091, 1094 (La. Ct. App. 1992).

Therefore, despite Defendant's protestations about the vagaries of the Napoleonic Code, this Court is more than capable of applying the same tort law that it does in Colorado cases.

Defendant also argues that Louisiana has a special interest in resolving "novel negligence claims" based in COVID-19 related injuries. ECF No. 21 at 14, n.14. However, courts in Louisiana have already begun deciding elements of COVID-19 related negligence claims and other Louisiana cases have these claims pending. *Manyweather v. Woodlawn Manor*, No. 3:21-CV-1317, 2021 WL 5183514, at *6 (W.D. La. Oct. 22, 2021), *report and recommendation adopted sub nom. Manyweather v. Woodlawn Manor, Inc.,* No. 3:21-CV-1317, 2021 WL 5181649 (W.D. La. Nov. 8, 2021); *Jones v. Legacy Mgmt. Grp. of Louisiana LLC*, No. 6:21-CV-00838, 2021 WL 3416993, at *6 (W.D. La. July 7, 2021), *report and recommendation adopted,* No. 6:21-CV-00838, 2021 WL 3416974 (W.D. La. Aug. 4, 2021). As such, Louisiana courts will have full opportunity to decide negligence cases based on the failure to protect from COVID-19 before this Court renders its decision in this case.

Further, Defendant fails to explain why cases involving COVID-19 present any novel legal issues when Louisiana courts have regularly decided negligence claims based on other communicable diseases. *See e.g. Verdun,* 598 So. 2d at 1099 (marine bacteria); *Dupuy v. NMC Operating Co.,* 187 So. 3d 436 (La. 2016) (osteomyelitis infection); *Seaman v. Howard*, 834 So. 2d 1288, 1289 (La. App. 3 Cir. 2002) (HIV).

Finally, to the extent that Louisiana has any interest in adjudicating these claims, those interests are outweighed by the federal nature of the claims against the United States here. As other district judges have explained, "[i]mmigration, and the treatment of those who have entered the United States without inspection is a matter of national concern."*Alvarado*, 2017 WL 2303758, at *8 (rejecting argument similar to Defendant's where "Plaintiffs were held in federal

detention centers and allege mistreatment by federal officers in violation of federal policies."); *Doe*, 2017 WL 4864850, at *3. Any claim that immigration officers beat and choked Mr. Fuanya equally impacts Colorado-based considerations. Thus, like other courts to consider this factor in the immigration context, the Court should accord no weight to Defendant's assertion that the public interest favors transfer.

### G. All Other Considerations of a Practical Nature That Make a Trial Easy, Expeditious And Economical.

Defendant argues that undersigned counsel's location in Louisiana favors transfer. However, "'location of counsel' is irrelevant and improper for consideration in determining the question of transfer of venue."*Congo Works,* 2019 WL 13036161, at *5 (quoting *In re Horseshoe Entm't*, 337 F.3d 429, 434 (5th Cir. 2003)).

Finally, Defendant argues that transferring the case to Louisiana "would favor the interests of efficiency and finality" because the case would begin anew if Defendant prevailed on appeal. ECF No. 21 at 13. However, when a court grants or denies a motion to transfer, both parties have the right to appeal upon final judgment. *In re Sorrells*, 218 B.R. 580, 582 (B.A.P. 10th Cir. 1998). Given the overwhelming body of case law detailed above declining to transfer the cases of plaintiffs situated similarly to Mr. Fuanya, the greater risk of reversal lies in granting the motion. At very least, this factor does not cut in favor of the Defendant. In sum, the balancing of the applicable factors in this case weighs strongly against transfer.

### CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to dismiss or transfer this action to the Western District of Louisiana.

Dated: December 21, 2021                          Respectfully submitted,

                                                   _/s/_ Jeremy Jong_____

Jeremy Jong
Al Otro Lado
3511 Banks Street
New Orleans, LA 70119
Telephone: (504) 475-6728
Email: jeremy@alotrolado.org

*Pro Bono Counsel for Plaintiff*